IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WILLIAM J. EINHORN, Administrator of the Teamsters Pension Trust Fund of Philadelphia and Vicinity, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | Civil Action No. 12-6814 (JBS/JS) |
| v. | **OPINION** |
| DUBIN BROTHERS LUMBER CO., INC., | |
| Defendant. | |

APPEARANCES:

Matthew D. Areman, Esq.
MARKOWITZ & RICHMAN
123 South Broad Street
Suite 2020
Philadelphia, PA 09109
    Attorney for Plaintiff William J. Einhorn, Administrator of
    the Teamsters Pension Trust Fund of Philadelphia and
    Vicinity

Liam Y. Braber, Esq.
JACOBY DONNER, PC
309 Fellowship Road
Suite 200
Mount Laurel, NJ 08054
    Attorney for Defendant Dubin Brothers Lumber Co., Inc.

**SIMANDLE, Chief Judge:**

**I.     INTRODUCTION**

This matter comes before the Court on Plaintiff William J. Einhorn's motion for summary judgment.[1] [Docket Item 19.] Plaintiff argues that he is entitled to summary judgment as to amounts owed by Defendant Dubin Brothers Lumber Co., Inc. to the Teamsters Pension Trust Fund of Philadelphia and Vicinity pursuant to a 2011 settlement agreement between the parties, as well as to amounts owed as the result of withdrawal liability under Sections 502(g)(2) and 4301(e) of the Employee Retirement Income Security Act of 1974 ("ERISA").

The primary issues presented are whether withdrawal liability under ERISA is properly discharged under a Chapter 11 bankruptcy filed seven years before an employer withdraws completely from the fund, and whether an employer's failure to challenge the amount or existence of withdrawal liability through arbitration precludes the employer from arguing in a civil action to collect withdrawal liability that a portion of that liability was discharged through bankruptcy.

For the reasons discussed below, the Court will grant Plaintiff's motion for summary judgment.

---

[1] Einhorn is the administrator of the Teamsters Pension Trust Fund of Philadelphia and Vicinity.

## II.   BACKGROUND

### A. Facts

The following facts are undisputed. At all relevant times, Plaintiff William J. Einhorn has been the Administrator of the Teamsters Pension Trust Fund of Philadelphia and Vicinity ("the Fund"). (Pl. Statement of Material Facts ("SMF") [Docket Item 19-2] ¶ 1.) The Fund is a multiemployer pension plan and an employee pension benefit plan maintained to provide retirement and related benefits to eligible participants and beneficiaries. (Id. ¶ 3.) The Fund receives contributions from employers who are obligated to make those contributions pursuant to collective bargaining agreements with various local unions affiliated with the International Brotherhood of Teamsters. (Id. ¶ 4.) Defendant Dubin Brothers Lumber Co., Inc. does business as Suburban Lumber Company and has participated in the Fund pursuant to a series of collective bargaining agreements between it and the International Brotherhood of Teamsters, Local Union No. 676 ("the Union"). (Id. ¶ 6.) The most recent such collective bargaining agreement ("CBA") indicates effective dates from March 1, 2010 to February 28, 2013. (Id.; see also Certification of William J. Einhorn ("Einhorn Cert."), Ex. A [Docket Item 19-3.]) The CBA requires Defendant to make timely contributions to the Fund for each hour worked by each employee covered by the CBA. (SMF ¶ 7; see also Einhorn Cert., Ex. A at Art. 61.)

3

Participating employers are bound by the terms of the Fund's plan documents. (SMF ¶ 8.)

In a letter dated May 28, 2009, the Fund notified Defendant of its determination that Defendant had "effected a complete withdrawal" from the Fund, as defined in 29 U.S.C. § 1383(a), on or about December 15, 2008, and demanded payment for withdrawal liability in the amount of $147,930.84. (Id. ¶ 9; see also Certification of Richard Dubin ("Dubin Cert."), Ex. B [Docket Item 27-3.]) Defendant subsequently failed to make its required withdrawal liability payments to the Fund. (Id. ¶ 10.) As a result, on October 6, 2010, the Trustees of the Fund filed a complaint in the United District Court for the District of New Jersey to collect Defendant's withdrawal liability payments. (Id. ¶ 11; see also Trustees of the Teamsters Pension Trust Fund of Philadelphia and Vicinity v. Dubin Bros. Lumber Co., Civ. 10-5149, ECF No. 1.) On May 18, 2011, the parties entered a Settlement Agreement, which provided in pertinent part:

> 1. Dubin acknowledges its obligation to make timely contributions to the Fund pursuant to its agreements with Teamster Local 676, dated May 18, 2011 (attached);
> 2. Dubin agrees to make retroactive payments to the Fund, pursuant to the aforementioned agreements with Teamsters Local 676, dated May 18, 2011;
> 3. If Dubin fails to make payment in accordance with Paragraph 2 of this Agreement, such shall constitute a material breach and default of this Agreement, in which event, Dubin shall be responsible for all monies released by this Agreement, and same will be due and owing to the Fund immediately;

> 4. Dubin hereby agrees to waive all statutes of limitations that may apply to any action or proceeding brought by the Funds to enforce this Agreement;
>
> 5. Upon execution of this Agreement by the Fund and Dubin, and upon receipt of the payments due pursuant to Paragraph 2, the Fund shall remise, release and forever discharge Dubin, their respective employees, officers, heirs, executors, administrators, personal representatives, attorneys, successors and assigns and all persons, which might be claimed to be jointly or severally liable with them, from any and all actions, causes of action, damages, suits, debts, claims and demands related to the specific subject matter (i.e., alleged December 2008 withdrawal and liability) of the Fund's Complaint (USDC, District of New Jersey Dkt. No. 10-5149), though nothing in this Agreement shall be construed to relieve Dubin of its ongoing obligations to the Fund, including any future liability to the Fund by reason of a future withdrawal from participation in the Fund.

(Settlement Agreement dated May 18, 2011 ("Settlement Agreement"), Einhorn Cert., Ex. B [Docket Item 19-3] ¶¶ 1-5.) The dollar amount of the retroactive pension contributions due pursuant to the Settlement Agreement was $9,218.97. (SMF ¶ 13.) These retroactive payments were simply the overdue contributions on behalf of covered employees, and they were not payments toward any withdrawal liability, since the parties agreed that Dubin would continue to contribute to the Fund as required by the collective bargaining agreement. On May 18, 2011, the Trustees of the Fund filed a notice of voluntary dismissal and the civil action against Defendant was terminated. (Id. ¶ 14; see also Civ. 10-5149, ECF No. 8.) Defendant paid a total of $5,000 toward the amount owed to the Fund for retroactive contributions through consistent payments of $1,000 per month

from November, 2011 through March, 2012, leaving $4,218.97 due under the Settlement Agreement. (SMF ¶¶ 15-16.) No subsequent payments toward these retroactive contributions have been made. (Dubin Cert. [Docket Item 27-2] ¶ 9.)

In a letter dated April 18, 2012, the Fund notified Defendant of its determination that Defendant "effected a complete withdrawal" from the Fund "during the 2011 Plan Year" and demanded payment of $209,956.78 (covering the years from 1979 to 2010) in quarterly installments beginning July 17, 2012. (Id. ¶ 19; see also Einhorn Cert., Ex. D [Docket Item 19-3.]) Having not received any payment from Defendant, on June 20, 2012, the Fund sent a second letter demanding that Defendant make its required payment within 60 days. (SMF ¶ 20; see also Einhorn Cert., Ex. E [Docket Item 19-3.]) Defendant admits that it made no further payments to the Fund. (SMF ¶ 21.) By letter dated August 21, 2012, the Fund advised Defendant that its failure to make timely withdrawal liability payments resulted in a default and demanded immediate payment with interest. (Id. ¶ 22; see also Einhorn Cert., Ex. F [Docket Item 19-3.]) Defendant admits that it never requested review of the Fund's determination and assessment of withdrawal liability. (SMF ¶ 23.) Defendant also admits that it never filed a demand for arbitration within the timeframe established under 29 U.S.C. § 1401. (Id. ¶ 24.)

Defendant made its last prospective hourly contribution to the Fund in early 2009 and did not contribute anything but retroactive payments to the fund under the Settlement Agreement. (Dubin Cert. ¶ 10.) Defendant has not employed a member of the Union since 2009. (Def.'s Resp. to Pl. SMF ("Def. SMF") [Docket Item 27-1] ¶¶ 18-20.) However, in May, 2011, around the time of the settlement agreement, Dubin represented that it had one covered employee, Steven Brees. The parties agreed at oral argument that Defendant employed Brees as a truck driver from January 1, 2010 to September 23, 2011. Brees ultimately declined to join the Union. Brees was thus a covered employee under the Plan, for whom Defendant was obligated to make pension contributions under the collective bargaining agreement. (Einhorn Cert., Ex. A at Art. 61.)

Finally, going back a decade, on April 23, 2002, Defendant filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of New Jersey. (In re Dubin Bros Lumber Co., Inc., Bankr. No. 02-14096 (JHW), ECF No. 1.) The Bankruptcy Court entered an Order Confirming Chapter 11 Plan on February 5, 2004, stating that the "Debtor shall be discharged of liability for payment of debts incurred before Confirmation, to the extent specified in 11 U.S.C. § 1141." (Id., ECF No. 196; see also Dubin Cert., Ex. A [Docket Item 27-

3] at 3, 22.) Defendant's Chapter 11 Plan from 2004 did not
refer to any liability to the Fund.

### B. Procedural history

On November 2, 2012, Plaintiff filed a Complaint seeking to
collect amounts due pursuant to Sections 502(g)(2) and 4301(e)
of ERISA for withdrawal liability in a total of $209,956.78, as
well as amounts due pursuant to the May 18, 2011 Settlement
Agreement. [Docket Item 1.] Pursuant to an Amended Scheduling
Order entered July 16, 2013, Judge Schneider extended pretrial
factual discovery to September 30, 2013. Consistent with the
Amended Scheduling Order, Plaintiff filed the instant motion for
summary judgment [Docket Item 19], Defendant filed opposition
[Docket Item 27], and Plaintiff filed a reply [Docket Item 28].
The Court heard oral argument on June 18, 2014.

### III. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a). A dispute is "genuine" if "the evidence is such that a
reasonable jury could return a verdict for the non-moving
party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986). A fact is "material" only if it might affect the outcome
of the suit under the applicable rule of law. Id. Disputes over
irrelevant or unnecessary facts will not preclude a grant of

8

summary judgment. Id. The Court will view any evidence in favor of the nonmoving party, here the defendant, and extend any reasonable favorable inferences to be drawn from that evidence to that party. Scott v. Harris, 550 U.S. 372, 378 (2007).

## IV. DISCUSSION

Plaintiff seeks summary judgment on the first count of the Complaint for breach of the Settlement Agreement and on the second count of the Complaint for withdrawal liability. Plaintiff also seeks interest, liquidated damages, and attorney's fees and costs. Defendant responds with three arguments: (1) Defendant's 2004 Chapter 11 bankruptcy discharged any pre-confirmation withdrawal liability; (2) Plaintiff's recovery is limited to the terms of the 2011 settlement agreement; and (3) Plaintiff's claim for withdrawal liability is barred by the doctrine of laches.

### A. Effect of bankruptcy on withdrawal liability

Plaintiff argues that the Fund is entitled to summary judgment on his claim against Defendant for withdrawal liability because Defendant was properly notified of the withdrawal liability assessment and Defendant failed to timely request review or invoke the mandatory arbitration procedure established by the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. § 1381 et seq. ("MPPAA"). Defendant does not dispute that it received proper notification of the withdrawal liability

9

assessment and failed to administratively challenge the amount
of liability for the years covered by the second assessment
(1979 to 2010). Defendant only argues that its Chapter 11
bankruptcy discharged its pre-confirmation withdrawal liability
and such a defense was not waived by its failure to pursue
arbitration.

The MPPAA amended ERISA and was enacted "out of a concern
that ERISA did not adequately protect multiemployer pension
plans from the adverse consequences that result when individual
employers terminate their participation or withdraw." SUPERVALU,
Inc. v. Bd. of Trustees of Sw. Pennsylvania & W. Maryland Area
Teamsters & Employers Pension Fund, 500 F.3d 334, 336 (3d Cir.
2007) (quoting Warner-Lambert Co. v. United Retail & Wholesale
Employee's Teamster Local No. 115 Pension Plan, 791 F.2d 283,
284 (3d Cir. 1986) (internal citation omitted)). "The . . .
amendments to ERISA were designed to prevent employers from
withdrawing from a multiemployer pension plan without paying
their share of unfunded, vested benefit liability, thereby
threatening the solvency of such plans." Id. (citation omitted).
If an employer withdraws from a multiemployer plan, then the
employer is liable for its share of the plan's unfunded vested
benefits. See 29 U.S.C. §§ 1381, 1391. Under the MPPAA,
"complete withdrawal" occurs when an employer "(1) permanently
ceases to have an obligation to contribute under the plan, or

(2) permanently ceases all covered operations under the plan."
29 U.S.C. § 1383(a).

The Court must first address whether Defendant, by failing
to invoke the mandatory arbitration procedures under the MPPAA,
waived its right to argue that withdrawal liability was
discharged through its 2004 bankruptcy. Under the MPPAA, "[a]ny
dispute between an employer and the plan sponsor of a
multiemployer plan concerning a determination made under
sections 1381 through 1399 . . . shall be resolved through
arbitration." 29 U.S.C. § 1401(a)(1). "If no arbitration
proceeding has been initiated pursuant to [section 1401(a)(1)],
the amounts demanded by the plan sponsor under section
1399(b)(1) . . . shall be due and owing . . . [and the plan
sponsor] may bring an action . . . for collection." 29 U.S.C. §
1401(b)(1). "[S]ections 1381 through 1399 are technical
provisions, describing how and when withdrawal liability is to
be assessed." Carl Colteryahn Dairy, Inc. v. W. Pennsylvania
Teamsters & Employers Pension Fund, 847 F.2d 113, 118 (3d Cir.
1988). In the Third Circuit, "even pure issues of statutory
interpretation are subject to MPPAA's arbitration requirements
if they involve sections 1381–1399." Einhorn v. Kaleck Bros.,
Inc., 713 F. Supp. 2d 417, 421-22 (D.N.J. 2010) (quoting Crown
Cork & Seal Co., Inc. v. Central States Southeast and Southwest
Areas Pension Fund, 881 F.2d 11, 18 (3d Cir. 1989)); see also

11

<u>Flying Tiger Line v. Teamsters Pension Trust Fund of</u>
<u>Philadelphia</u>, 830 F.2d 1241, 1255 (3d Cir. 1987) (rejecting
argument that only factual matters are appropriate for
arbitration).

However, the Third Circuit has recognized a distinction
between disputes regarding MPPAA sections 1381 through 1399 and
disputes not implicating these sections. <u>Flying Tiger</u>, 830 F.2d
at 1250. Similarly, courts outside this circuit have explained
that "the only defenses which are waived by a failure to timely
initiate arbitration are those which go to the merits of the
liability assessment itself." <u>In re Centric Corp.</u>, 901 F.2d
1514, 1518 (10th Cir. 1990). Where, as here, the defendant does
not dispute the amount or existence of the withdrawal liability,
but invokes the provisions of the Bankruptcy Code to discharge
the then-existing obligations, the case is governed by the
provisions of the Bankruptcy Code. <u>Carpenters Pension Trust Fund</u>
<u>for N. California v. Moxley</u>, 734 F.3d 864, 870-71 (9th Cir.
2013). As such, the defendant does not waive its right to a
discharge of withdrawal liability under the Bankruptcy Code
because it failed to challenge the amount or existence of the
liability in arbitration. <u>Id.</u> at 870.

The Court is unpersuaded by Plaintiff's attempt to
distinguish <u>Moxley</u> from the present case for purposes of his
waiver argument. Plaintiff notes that in <u>Moxley</u>, the employer

12

filed for bankruptcy after the fund filed suit to collect the employer's withdrawal liability. Id. at 866. As in Moxley, Defendant here does not contest the amount or existence of its withdrawal liability. Defendant only argues that its pre-confirmation withdrawal liability was discharged through its 2004 bankruptcy. The Court acknowledges that Defendant in the present case seeks to invoke a bankruptcy proceeding over seven years prior to the second assessment date and the employer in Moxley could not have raised its bankruptcy argument in arbitration proceedings because it only filed for bankruptcy after the fund filed suit. However, the Court's holding that Defendant has not waived its argument regarding discharge of withdrawal liability through bankruptcy rests on the Court's interpretation of the MPPAA to only require arbitration of disputes implicating sections 1381 through 1399 regarding how and when withdrawal liability is to be assessed. As such, the timing of Defendant's bankruptcy petition is immaterial to the Court's analysis of the waiver issue.

The Court next considers whether Defendant's withdrawal liability or some portion thereof was discharged in Defendant's 2004 bankruptcy prior to Defendant's actual withdrawal from the fund. The Court concludes that it was not.

Although there is no Third Circuit precedent directly on point, the Court of Appeals' treatment of ERISA withdrawal

13

liability under the Bankruptcy Code in different contexts sheds light on the Court's analysis here. In In re Marcal Paper Mills, Inc., 650 F.3d 311 (3d Cir. 2011), the Third Circuit considered whether the portion of withdrawal liability incurred after an employer filed a Chapter 11 petition constituted an administrative expense entitled to priority under the Code. Marcal, 650 F.3d at 313. The Court held that withdrawal liability may be apportioned between pre and post-petition periods and the post-petition amount may be considered an administrative expense under the Code. Id. at 317. The Court of Appeals explained that "[u]nfunded vested benefits from which withdrawal liability is calculated are benefits which are promised and earned but not yet funded as of the calculation day. The liability for unfunded vested benefits represents a pre-existing obligation on the employer's part, and is not simply incurred as of the date of withdrawal. In other words, the unfunded vested benefit calculation represents an employer's share of the amount needed for a fund to break even *as of the calculation date.*" Id. at 318 (quoting Huber v. Casablanca Indus., Inc., 916 F.2d 85, 96 (3d Cir. 1990) (internal punctuation and quotations omitted)). The Marcal Court concluded that "by permitting the post-petition portion of the withdrawal liability to be classified as an administrative expense, Congress' objectives in passing the MPPAA are fulfilled. If

14

withdrawal liability in its entirety were automatically classified as a general unsecured claim, it would greatly undercut the purpose of the MPPAA to secure the finances of pension funds and prevent an employer's withdrawal from negatively affecting the plan and its employee beneficiaries." Id. at 321.

In an earlier Third Circuit decision, Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164 (3d Cir. 2002), the board of trustees of a pension fund sought to recover withdrawal liability from several corporations and individuals on an alter ego theory. The Court of Appeals held that the board of trustees of the pension fund was the proper party to pursue such a judgment because the claim for withdrawal liability was specific to the creditor. Foodtown, 296 F.3d at 170-72. Further, the Court found that where withdrawal liability did not arise until after the filing of the bankruptcy petition, such liability could not be considered the property of the bankruptcy estate. Id. at 168-70. The Court explained that because the employer did not cease operations and continued to make contributions after filing the bankruptcy petition, the claim for withdrawal liability did not arise until after the filing of the bankruptcy petition. Id. at 170. Notably, "the date of withdrawal is the date that operations actually cease— the date does not relate back to the date of filing of a Chapter

15

11 petition if operations have continued thereafter." Id. at
169.

Defendant relies on In re Art Shirt Ltd., Inc., 93 B.R. 333
(E.D. Pa. 1988), in which the court found that withdrawal
liability under the MPPAA is "a debt which should be considered
in determining insolvency under the Code" because withdrawal
liability satisfies the relevant definitions of "debt" and
"claim" in the bankruptcy context. Art Shirt, 93 B.R. at 338.
However, the court in Matter of United Merchants & Mfrs., Inc.,
166 B.R. 234, 241 (Bankr. D. Del. 1994) expressly rejected the
court's reasoning in Art Shirt. In United Merchants, the court
considered whether liability for future contributions or
withdrawal was discharged as part of a Chapter 11 bankruptcy
proceeding filed before the employer withdrew from the fund.
United Merchants, 166 B.R. at 236-37. The court began its
analysis by noting that the "Third Circuit Court of Appeals has
held in analyzing the issue of when a claim arises [under the
Bankruptcy Code], there must exist a legal relationship that
gives rise to the asserted right to payment." Id. at 237 (citing
In re Remington Rand Corp., 836 F.2d 825 (3d Cir. 1988)). The
court rejected the employer's argument that "the legal
relationship Remington requires arose when [the employer] became
obligated to contribute to the Fund in 1985" because this
argument "ignores the statutory origins of the withdrawal

16

liability action." Id. at 238-39. The court found the reasoning in Art Shirt pertinent to single employer plans, but inapplicable to a contributing employer in a multiemployer plan which has satisfied its minimum funding obligations. Id. at 240. After noting that Congress enacted the MPPAA provisions regarding withdrawal liability to relieve the burden on remaining employers and eliminate the incentive to withdraw from the fund, the court concluded that "the Fund did not possess a bankruptcy claim for withdrawal liability pre-confirmation" because "[i]t is . . . withdrawal that first creates the legal relationship which gives rise to the asserted right to payment." Id. at 241. Thus, where a contributing employer in a multiemployer plan has satisfied its minimum funding obligations and there has been no withdrawal prior to bankruptcy, the fund had no "claim" for withdrawal liability that would be discharged in bankruptcy.

The Court recognizes that courts outside the Third Circuit are divided as to the treatment of withdrawal liability under the Bankruptcy Code. See In re Bayly Corp., 163 F.3d 1205, 1209 (10th Cir. 1998) ("Courts have uniformly concluded that withdrawal liability based on benefits earned as a result of employees' pre-petition labor, even if incurred post-petition, is a pre-petition contingent liability under bankruptcy law."); Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc., 789 F.2d

17

98, 103-04 (2d Cir. 1986) ("Since withdrawal liability is based on the withdrawing employer's contributions to the Plan prior to the year before the employer withdraws, 29 U.S.C. § 1391, McFarlin's withdrawal liability is related to the years 1975-81. The consideration supporting its withdrawal liability was, therefore, the work of employees in the alteration department during those earlier years."); In re CD Realty Partners, 205 B.R. 651, 658-59 (Bankr. D. Mass. 1997) ("Withdrawal itself is the event that triggers the assessment of withdrawal liability, but it is the employer's prior participation in the plan that, through ERISA, 'triggers' or imposes on that employer, by one mechanism or another, the obligation to shoulder its share of the plan's underfunding liability. And the existence of such liability was, upon plan confirmation, a reasonable possibility that the parties could and should fairly have anticipated."). But see CPT Holdings, Inc. v. Indus. & Allied Employees Union Pension Plan, Local 73, 162 F.3d 405, 409 (6th Cir. 1998) ("Withdrawal liability is not a 'claim' prior to confirmation. Although the Bankruptcy Code defines 'claim' broadly, the relevant non-bankruptcy law must be examined to see whether a right to payment, even a contingent right, exists. It is possible that an employer could fail to make every required contribution to a multiemployer pension plan, eventually

18

withdraw from the plan, and still be assessed no withdrawal liability.").

Defendant again relies on Carpenters Pension Trust Fund for N. California v. Moxley, 734 F.3d 864 (9th Cir. 2013), in which the Ninth Circuit found withdrawal liability to be dischargeable in a bankruptcy filed after the employer withdrew from the fund. Moxley, 734 F.3d at 870. The Ninth Circuit distinguished unpaid fund contributions from withdrawal liability and held that the debtor-employer was not a fiduciary of the fund because the unpaid withdrawal liability, which does not arise until the employer ceases to have an obligation to contribute under the plan, could not be considered an asset of the fund. Id. at 868-70. However, as Plaintiff notes, the fund filed suit in the District Court for the Northern District of California, but soon thereafter, the proceedings were stayed when the employer filed for bankruptcy. The present case is distinguishable because Defendant seeks to invoke a bankruptcy filed seven years prior to the assessment of withdrawal liability and which was silent as to any liability of the Defendant to the Fund.

Moreover, the cases which suggest that withdrawal liability is dischargeable in a bankruptcy proceeding filed prior to the date of withdrawal from the fund are non-binding and inconsistent with Third Circuit precedent. First, only CD Realty Partners squarely addressed the issue in the present case. See

19

In re Bayly Corp., 163 F.3d 1205, 1211 (10th Cir. 1998)

(determining whether funds' claim for withdrawal liability was

entitled to administrative priority); Trustees of Amalgamated

Ins. Fund v. McFarlin's, Inc., 789 F.2d 98, 103-04 (2d Cir.

1986) (same). Second, the reasoning of these courts conflicts

with the Third Circuit's holding in Foodtown that where an

employer does not cease operations and continues to make

contributions after filing a bankruptcy petition, the claim for

withdrawal liability does not arise until after the filing of

the bankruptcy petition.

Further, Marcal does not support Defendant's position. As

this Court has previously explained,

> The Marcal court confronted a different factual and legal
> situation from the instant one, namely, whether assessed
> withdrawal liability of an employer who had declared
> bankruptcy could be apportioned to pre- and post-petition
> amounts. The court concluded that it could, reasoning that,
> once the employer withdrew from the pension fund (several
> months after petitioning for bankruptcy protection), the
> assessed withdrawal liability could be determined to
> represent some portion of benefits earned by employees
> before and some portion earned after the time when the
> employer filed its bankruptcy petition. Id. at 320. Thus,
> at most, Marcal held that once an employer withdraws
> pursuant to the MPPAA, the assessed withdrawal liability
> can be *attributed* to different time periods, but does not
> indicate that the employer's withdrawal liability debt
> *vests* or is automatically due and owing as each employee
> hour is worked. It could not be otherwise, in fact, because
> an employer that never withdraws from a plan will, pursuant
> to the MPPAA, never be required to pay such liability.

Einhorn v. Twentieth Century Refuse Removal Co., Civ. 11-1451

(JBS/AMD), 2011 WL 6779760, at *8 (D.N.J. Dec. 22, 2011). In the

present case, the Court is not asked to consider any portion of Defendant's withdrawal liability as an administrative expense, and no issue of liability to the Fund was ever identified before the Bankruptcy Court in 2004. At the time of the certification of Dubin's plan in 2004, Dubin's payments to the Fund were up to date, its employees were covered by the Plan, and no event of "withdrawal" would occur until years later. Quite clearly, Defendant listed no liability to the Fund in its 2004 confirmation plan because it too understood that it had none at the time. Indeed, this is not a bankruptcy appeal and such treatment would be nonsensical at this late juncture to deem some portion of withdrawal liability as an administrative expense.

Accordingly, the Court finds that the Fund did not possess a bankruptcy claim for the pre-confirmation portion of its withdrawal liability because it is actual withdrawal from the fund that first creates the legal relationship which gives rise to the asserted right to payment of withdrawal liability for the purposes of the Bankruptcy Code. Therefore, the Court rejects Defendant's argument that its pre-confirmation withdrawal liability was discharged through a bankruptcy proceeding seven years before its withdrawal liability became due.[2]

_____

[2] Defendant also relies on an amendment to the Financial Accounting Standards Codification "which requires employers to

In light of the foregoing and Defendant's concession that it waived its right to challenge the amount or existence of its withdrawal liability as assessed in the letter dated April 18, 2012, Plaintiff is entitled to the full amount assessed by the Fund for Defendant's 2011 withdrawal liability: $209,956.78.

**B. Breach of settlement agreement**

In Count I of the Complaint, Plaintiff seeks recovery for breach of the May 18, 2011 Settlement Agreement between the parties in the amount of $4,218.97. Plaintiff asserts that the Fund is entitled to summary judgment as a matter of law on Count I because Defendant breached the Settlement Agreement and Plaintiff should be awarded the amount of unpaid retroactive contributions required under the Agreement. Defendant admits

---

disclose in annual financial statements their participation in a multiemployer pension plan." (Def. Opp. at 7.) First, it should be clear that the accounting standards promulgated by the Financial Accounting Standards Board are not binding in the Court's analysis. Second, the provision cited by Defendant is not contrary to the Court's conclusion that withdrawal liability does not arise until the date an employer actually withdraws from the plan. The amendment directs employers to disclose participation in a multiemployer pension plan "if it is either probable or reasonably possible that . . . [a]n employer would withdraw from the plan under circumstances that would give rise to an obligation." (Dubin Cert., Ex. G [Docket Item 27-3] at 6.) This language simply acknowledges the potential for withdrawal liability as established under the MPPAA. It does not suggest that such liability arises prior to actual withdrawal. It requires disclosure of participation in a multiemployer pension plan when it is "probable or reasonably possible" that a future obligation for withdrawal liability will arise, and it does not suggest that mere participation in a multiemployer pension plan triggers any current indebtedness.

that $4,218.97 in retroactive contributions remain unpaid under
the Agreement, but argues that it was Plaintiff that breached
the Agreement because Defendant only ceased payments under the
Agreement when Plaintiff provided notice of the second
assessment. Defendant contends that the Agreement remains an
enforceable contract, including the terms in paragraph 5
releasing any and all claims for the liability assessed in the
letter dated May 28, 2009.

"Under New Jersey law, a settlement agreement is a form of
contract, and courts must look to the general rules of contract
law to resolve disputes over a settlement agreement." Mortellite
v. Novartis Crop Prot., Inc., 460 F.3d 483, 492 (3d Cir. 2006).
It is undisputed that on or about May 28, 2009, the Fund
determined that Defendant had failed to make the periodic
contributions to the Fund on behalf of covered employees, and
thereby had withdrawn from the Fund on December 15, 2008. As a
result of Defendant's failure to make required withdrawal
liability payments, the Fund filed a Complaint in the United
States District Court for the District of New Jersey. The
parties then entered a settlement agreement on May 18, 2011
which provided for Defendant's continued participation in the
Fund (that is, Defendant's non-withdrawal), as well as
retroactive delinquent contribution payments. The amount of the
settlement was exactly the amount of delinquent contributions.

The parties agree that the May 18, 2011 Settlement Agreement was a valid, enforceable contract.

Paragraph 5 of the Agreement clearly provides that Defendant's withdrawal liability will be forgiven so long as Defendant satisfies the terms of the Agreement. The Agreement also makes clear that Defendant would be liable for any future withdrawal liability. Paragraph 5 provides:

> 5. Upon execution of this Agreement by the Fund and Dubin, and upon receipt of the payments due pursuant to Paragraph 2, the Fund shall remise, release and forever discharge Dubin, their respective employees, officers, heirs, executors, administrators, personal representatives, attorneys, successors and assigns and all persons, which might be claimed to be jointly or severally liable with them, from any and all actions, causes of action, damages, suits, debts, claims and demands related to the specific subject matter (i.e., alleged December 2008 withdrawal and liability) of the Fund's Complaint (USDC, District of New Jersey Dkt. No. 10-5149), though nothing in this Agreement shall be construed to relieve Dubin of its ongoing obligations to the Fund, including any future liability to the Fund by reason of a future withdrawal from participation in the Fund.

(Settlement Agreement ¶ 5) (emphasis added).

It is clear that the release of liability for the "December 2008 withdrawal" was contingent upon Defendant making future contributions and retroactive contribution payments. There is no question that Defendant breached the Agreement when it stopped making retroactive payments. Defendant's argument that Plaintiff somehow breached the Agreement by issuing a second assessment for withdrawal liability is meritless because future withdrawal

24

liability was not foreclosed by the Agreement. To the contrary, the Agreement expressly preserved the Fund's right to pursue future liability for a withdrawal from the Fund. Therefore, as a consequence of Defendant's breach and as provided in Paragraph 3 of the Agreement, Defendant is responsible for "all monies released by this Agreement, and same will be due and owing to the Fund immediately." (Settlement Agreement ¶ 3.)

Plaintiff is permitted to recover the $4,218.97 remaining due under the Agreement for delinquent retroactive contributions. This indebtedness under the breach of the Settlement Agreement simply reflects the amount due under that agreement to recover the unpaid contributions to the Fund. The obligation to make contributions to the Fund is a liability that is separate from the obligation to pay withdrawal liability when the employer ceases its participation under the Plan. Therefore, the Court finds that Defendant breached the Agreement upon failing to make the requisite retroactive payments and Plaintiff is entitled to judgment for the unpaid delinquent contributions in the amount of $4,218.97.[3]

---

[3] Plaintiff would also be entitled to recover for the 2008 withdrawal liability that was also addressed by the Settlement Agreement, but that would provide a double recovery to Plaintiff since the calculation of the 2012 withdrawal liability already includes the earlier period.

**C. Laches**

Defendant also argues that the Fund's claim for withdrawal liability fails under the doctrine of laches because the Fund notified Defendant of the second assessment in May, 2012 despite Defendant's failure to make prospective contributions to the Fund since 2009. Defendant thus contends that it withdrew from the Fund in 2009 and it was inequitable for the Fund to wait until 2012 to assert a second claim for withdrawal liability. Plaintiff responds that Defendant has waived its laches defense because Defendant failed to raise the issue in arbitration and that the Fund immediately fulfilled its obligations under the MPPAA upon learning in 2011 that Defendant ceased to have an obligation to contribute to the Fund.

The Court need not determine whether Defendant waived its laches argument by failing to pursue arbitration because Defendant's argument is meritless. The Fund clearly satisfied its statutory obligations and to find otherwise would be inequitable to Plaintiff. Once the Fund determined that Defendant ceased to have an obligation to contribute to the Fund as a result of no longer employing any covered employees,[4] the

---

[4] The Court rejects Defendant's argument that it could not have withdrawn from the Fund a second time because it stopped making prospective contributions to the Fund in 2009. First, the Settlement Agreement clearly contemplates Defendant's continued participation in the Fund. Second, withdrawal occurs when an employer "(1) permanently ceases to have an obligation to

26

Fund notified Defendant by letter dated April 18, 2012 of its obligation to pay Defendant's withdrawal liability.[5] Having received no payments, the Fund sent a letter dated June 20, 2012 demanding payment within 60 days. After Defendant failed to make required payments, the Fund sent a third letter dated August 21, 2012 notifying Defendant that it was in default. The Fund promptly initiated legal action on November 2, 2012 after satisfying the statutory notification requirements. As such, Plaintiff complied with all statutory requirements and promptly initiated the instant action. Therefore, the Court finds that neither inexcusable delay by Plaintiff, nor prejudice to Defendant as required to establish a laches defense. <u>Santana Products, Inc. v. Bobrick Washroom Equip., Inc.</u>, 401 F.3d 123,

---

contribute under the plan, or (2) permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a). Defendant did not cease to have an obligation to contribute under the plan by virtue of not contributing. Instead, following the Settlement Agreement, Defendant ceased to have an obligation to contribute when Brees' employment ended in 2011. Although Brees was not a member of the Union, Defendant failed to refute Plaintiff's contention that, as a truck driver for Defendant, Brees was still considered a covered employee under the CBA. (Dubin Cert., Ex. A [Docket Item 19-3] at 1.)

[5] The Supreme Court has noted that Congress adopted a flexible standard for the initial determination of withdrawal liability by the fund, requiring the fund to calculate withdrawal liability "as soon as practicable." <u>Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of California, Inc.</u>, 522 U.S. 192, 205 (1997). The Court expressly stated that "if an employer believes the trustees have failed to comply with their 'as soon as practicable' responsibility, the employer may assert that violation as a laches objection at an arbitration contesting the withdrawal liability assessment." <u>Id.</u>

138 (3d Cir. 2005) (citing Univ. of Pittsburgh v. Champion Products Inc., 686 F.2d 1040, 1044 (3d Cir. 1982)).

**D. Interest, liquidated damages, and attorney's fees and costs**

Plaintiff asserts that the Fund is entitled to interest, liquidated damages, and attorney's fees and costs. Defendant makes no argument in opposition.

Under the MPPAA, an action to compel an employer to pay withdrawal liability is "treated in the same manner as a delinquent contribution" as defined in 29 U.S.C. § 1145. See 29 U.S.C. § 1451(b); Trustees of Amalgamated Ins. Fund v. Sheldon Hall Clothing, Inc., 862 F.2d 1020, 1023 (3d Cir. 1988). As such, if the fund prevails in an action to collect withdrawal liability, the fund must be awarded the withdrawal liability amount, interest on the unpaid amount, liquidated damages, and attorney's fees and costs. See § 1132(g)(2);[6] see also Sheldon

---

[6] 29 U.S.C. § 1132(g)(2) provides:
    In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan--
    (A) the unpaid contributions,
    (B) interest on the unpaid contributions,
    (C) an amount equal to the greater of--
    (i) interest on the unpaid contributions, or
    (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

Hall Clothing, 862 F.2d at 1023 ("[W]e note that award of these amounts plus reasonable attorney's fees is mandatory for the district court, not discretionary.") (citing cases).

Plaintiff seeks interest calculated from the date of default, August 21, 2012 through January 6, 2014, the return date of the instant motion, at a rate of 3.25 percent for a total of $11,941.30. Plaintiff explained at oral argument that his calculation is based on 29 C.F.R. § 4219.32.[7] The Court

---

(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
(E) such other legal or equitable relief as the court deems appropriate.
For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26.

[7] 29 C.F.R. § 4219.32 provides:
(a) Interest assessed. The plan sponsor of a multiemployer plan--
(1) Shall assess interest on overdue withdrawal liability payments from the due date, as defined in paragraph (d) of this section, until the date paid, as defined in paragraph (e); and
(2) In the event of a default, may assess interest on any accelerated portion of the outstanding withdrawal liability from the due date, as defined in paragraph (d) of this section, until the date paid, as defined in paragraph (e).
(b) Interest rate. Except as otherwise provided in rules adopted by the plan pursuant to § 4219.33, interest under this section shall be charged or credited for each calendar quarter at an annual rate equal to the average quoted prime rate on short-term commercial loans for the fifteenth day (or next business day if the fifteenth day is not a business day) of the month preceding the beginning of each calendar quarter, as reported by the Board of Governors of the Federal Reserve System in Statistical Release H.15 ("Selected Interest Rates").

calculates interest under from August 21, 2012 to the date of judgment, July 15, 2014, in a total amount of $12,415.15. Plaintiff also seeks liquidated damages in the amount of $41,991.36, which is 20 percent of Defendant's withdrawal liability. Plaintiff contends that 20 percent is the percentage for liquidated damages provided in the plan and Defendant does not challenge Plaintiff's calculation. Therefore, the Court will award Plaintiff $12,415.15 in interest on Defendant's 2011 withdrawal liability and liquidated damages in the amount of $41,991.36, plus reasonable attorney's fees and costs. Finally,

---

(c) Calculation of interest. The interest rate under paragraph (b) of this section is the nominal rate for any calendar quarter or portion thereof. The amount of interest due the plan for overdue or defaulted withdrawal liability, or due the employer for overpayment, is equal to the overdue, defaulted, or overpaid amount multiplied by:

(1) For each full calendar quarter in the period from the due date (or date of overpayment) to the date paid (or date of refund), one-fourth of the annual rate in effect for that quarter;

(2) For each full calendar month in a partial quarter in that period, one-twelfth of the annual rate in effect for that quarter; and

(3) For each day in a partial month in that period, one-three-hundred-sixtieth of the annual rate in effect for that month.

(d) Due date. Except as otherwise provided in rules adopted by the plan, the due date from which interest accrues shall be, for an overdue withdrawal liability payment and for an amount of withdrawal liability in default, the date of the missed payment that gave rise to the delinquency or the default.

(e) Date paid. Any payment of withdrawal liability shall be deemed to have been paid on the date on which it is received.

Plaintiff is entitled to recover $4,218.97 for delinquent retroactive contributions arising from Defendant's breach of the 2011 Settlement Agreement.

**V.   CONCLUSION**

For the reasons discussed above, the Court will grant Plaintiff's motion for summary judgment. Plaintiff's motion is granted to the extent it seeks from Defendant the withdrawal liability as assessed in the letter dated April 18, 2012 in the amount of $209,956.78 and to the extent it seeks unpaid retroactive payments under the Settlement Agreement, in the amount of $4,218.97. The Court will also award Plaintiff $12,415.15 in interest on Defendant's 2011 withdrawal liability and liquidated damages in the amount of $41,991.36, plus reasonable attorney's fees and costs to which Plaintiff is entitled under 29 U.S.C. § 1132(g)(2). An accompanying Order will be entered.


**July 16, 2014**                              **s/ Jerome B. Simandle**
Date                                           JEROME B. SIMANDLE
                                               Chief U.S. District Judge